# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERIBERTO VALENCIA, | ) 1:11-cv—00021-LJO-SKO-HC |
| | ) |
| Petitioner, | ) FINDINGS AND RECOMMENDATIONS TO |
| | ) DENY THE PETITION FOR WRIT OF |
| | ) HABEAS CORPUS (Doc. 2), ENTER |
| v. | ) JUDGMENT FOR RESPONDENT, AND |
| | ) DECLINE TO ISSUE A CERTIFICATE OF |
| BRIAN HAWS, | ) APPEALABILITY |
| | ) |
| Respondent. | ) OBJECTIONS DEADLINE: |
| | ) THIRTY (30) DAYS |
| | ) |

Petitioner is a state prisoner proceeding with counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304. Pending before the Court is the petition, which was filed on January 6, 2011, and February 14, 2011.  Respondent filed an answer with supporting documentation on May 25, 2011, and Petitioner filed a traverse on May 27, 2011.

I.  Jurisdiction

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Furman v. Wood, 190 F.3d

1002, 1004 (9th Cir. 1999).

A district court may entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2254(a), 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n.7 (2000); <u>Wilson v. Corcoran</u>, 562 U.S. –, –, 131 S.Ct. 13, 16 (2010) (per curiam). Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his constitutional rights. The challenged judgment was rendered by the Kern County Superior Court (KCSC), which is located within the territorial jurisdiction of this Court. 28 U.S.C. §§ 84(b), 2254(a), 2241(a), (d).

Respondent filed an answer on behalf of Respondent Brian Haws, who was named by Petitioner as Warden of the California State Prison at Los Angeles County (LAC). (Pet., doc. 2, 1.) Petitioner thus named as a respondent a person who had custody of the Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts (Habeas Rules). <u>See</u>, <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994).

Accordingly, this Court has jurisdiction over the subject matter of this action and over Respondent Haws.

II. <u>Procedural Summary</u>

In KCSC case number BF117274A, Petitioner was convicted after a jury trial of first degree murder and conspiracy to commit the murder of Samuel George with enhancements for personally using a firearm and personally and intentionally

discharging a firearm and causing great bodily injury or death. (Pet., doc. 2, 1-2; ans., doc. 18, 6; LD 7, 2.)  Petitioner moved for a new trial, alleging prosecutorial misconduct, insufficient evidence to support the verdict, and failure to disclose exculpatory evidence. The trial court denied the motion.  (LD 7, 14.)[1]

Petitioner was sentenced on October 22, 2008, to a term of twenty-five years to life in state prison with a consecutive term of twenty-five years to life for intentionally discharging a firearm.  (Id. at 2.)

The Court of Appeal of the State of California, Fifth Appellate District (CCA) affirmed the judgment in a decision filed on February 16, 2010.  (LD 7, 36.)  The Supreme Court of the State of California (CSC) summarily denied Petitioner's petition for review without a statement of reasoning or authority on June 9, 2010.  (LD 8, LD 9.)

III.  Factual Summary

In a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.  28 U.S.C. § 2254(e)(1); Sanders v. Lamarque, 357 F.3d 943, 947-48 (9th Cir. 2004).  This presumption applies to a statement of facts drawn from a state appellate court's decision.  Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009).  The following

---

[1] "LD" refers to documents lodged by Respondent with the answer.

statement of facts is taken from the CCA's decision in <u>People v. Valencia</u>, case number F056446, filed on February 16, 2010.

### I. The Trial Testimony

#### *Introductory testimony*

George's body was discovered on a dirt road off of Breckenridge Road at approximately 3:00 p.m. on December 1, 2006. Carmen George testified that on the date of the murder, George, her husband, left the house around 1:30 p.m. in their vehicle.

#### *Eric Castro*

When George left his house, he drove to Eric Castro's house and asked Castro if he wanted to combine their money to buy some methamphetamine. Castro agreed and the two went to Valencia's house in George's vehicle. Valencia, Eugene Tofilo Lujan, and Robert Rangel, Jr., were present at the house when Castro and George unsuccessfully attempted to buy some methamphetamine. George then drove Castro to a nearby store to buy beer. Castro could not remember whether someone told them to go to the store and wait. While they were sitting in the vehicle at the liquor store, Lujan approached and told George to follow him if they still wanted to purchase some methamphetamine.

Lujan returned to Valencia's house, entered Valencia's vehicle, and the vehicle drove off. George and Castro followed. George stopped his vehicle behind Valencia's vehicle near some type of ranch. Lujan appeared to be doing something in the back seat of Valencia's vehicle. Lujan got out of Valencia's vehicle and dropped a small bag of methamphetamine. Castro told George to get out of the vehicle to purchase the methamphetamine. George exited his vehicle and walked towards Lujan. Lujan pulled a shotgun out of the back seat of Valencia's vehicle and shot George. Lujan froze. George ran towards the street. Valencia exited his vehicle and yelled, "get that fool," and chased George. Lujan began chasing George. Castro heard more shots and then saw George fall. Castro did not see Valencia shoot George, nor did Castro see Valencia with a gun. Castro drove away in George's vehicle because he was afraid he was going to be killed. He eventually drove home.

Castro rinsed the vehicle because it had George's blood on it. A short while later, Valencia and Lujan stopped in front of his house. Lujan told Castro that he should not say anything. After Lujan and Valencia left, Castro drove George's vehicle across the street from his house and parked it in the parking lot of an apartment

complex. Later that day, Castro and one of his friends, Ruben, went to Rangel's house. Castro went into the backyard where he saw Lujan, Valencia, and Rangel burning some clothes and saw Rangel digging a hole.

Later that same day, Lujan came by Castro's house with a can of engine degreaser. Castro gave Rangel the keys to George's car.

### Robert Rangel, Jr.

Rangel knew each of the individuals at the scene of the crime. He received immunity for his testimony at this trial.FN2 He lived in the house next to Valencia's house. On the morning of the shooting, Rangel went to Valencia's house to play video games. Lujan arrived later that morning. Lujan was not holding anything when he arrived.

> FN2. Rangel refused to testify unless granted immunity, apparently because he feared being prosecuted for committing perjury due to the dramatic differences between his testimony at Lujan's trial and this trial.

Castro and George arrived in George's vehicle and met Valencia, Lujan, and Rangel in the front yard of Valencia's house. Castro appeared to be high on drugs. Lujan began discussing drugs with George. George asked for $20 worth of methamphetamine. Rangel returned to the house to play the video game because he did not want to be involved in drug sales. Valencia followed Rangel inside the house. Castro and George went to the corner store in George's car, and Lujan joined Rangel and Valencia in the house. Lujan apparently told Castro and George to wait at the store.

Lujan began discussing killing George. Valencia did not say anything about George, although he did discuss selling methamphetamine to George. Rangel admitted he told detectives in an interview that after Valencia reentered the house, he began talking about George in a "weird way." Rangel testified that Valencia did not ask him what would happen if something were to happen to George. Lujan and Valencia joked about killing George. Valencia did not say "let's go shoot 'em" after Castro and George went to the store, and he could not recall telling detectives Valencia made such a statement.

Rangel did not see a shotgun in Valencia's residence before George was shot, nor did he recall telling detectives he saw a shotgun. Lujan did not want to sell George methamphetamine, although Rangel told detectives that he did. Rangel did not recall seeing Lujan with a flannel sweater that day, nor did he see Valencia give

5

Lujan a sweater. He did see a flannel sweater in the back seat of Valencia's SUV.

Rangel, Valencia, and Lujan left Valencia's residence in a SUV. Valencia drove, Rangel sat in the front passenger seat, and Lujan sat in the rear seat. As the SUV passed George's vehicle, Lujan waived for George to follow. Castro and George followed the vehicle. The SUV stopped near an orange grove, and Castro and George stopped nearby.

Lujan exited the SUV from the rear passenger door and began walking towards the rear of the SUV. Rangel saw George begin walking towards the SUV. Lujan returned to the open passenger door and pulled out a shotgun. George asked what he had done while holding up his hands, as if he were going to surrender. Lujan told George he had "fucked up." Rangel saw some bills in George's left hand. Lujan shot George as George prepared to run away. George began running away, and Lujan followed him. Rangel heard a second set of gunshots before Valencia got out of the vehicle. Valencia got out of the SUV and started running in different directions, but he did not follow Lujan and George. Valencia was screaming "like a girl" during these events. Rangel saw Valencia near George's body, but could not remember if he saw Valencia kneel near George's body.

Rangel admitted that he told the detectives that Valencia followed Lujan and George. Rangel then testified that Valencia exited the SUV as George was running away, and Valencia ran toward where George had fallen to the ground.

Rangel testified that he did not see Valencia shoot George, but admitted that he told detectives that he did see Valencia shoot George. Rangel did not remember telling detectives that after George fell, Valencia kept shooting him.

After the shooting stopped, Rangel saw Valencia and Lujan walk back to the SUV. Lujan was carrying a shotgun. Valencia was carrying the keys to the vehicle. Rangel did not see Valencia remove a handgun from his waistband when Valencia sat in the SUV. The three left the scene and went to Castro's house. They stayed for about 10 minutes and then went to Valencia's house. Everyone was acting weird.

Rangel first testified that Valencia stated he wanted to go to Rangel's house to burn the clothes he was wearing, but then testified that Valencia did not make such a statement. Rangel admitted they went to his house and Valencia and Lujan burned their clothes and

shoes. Castro came by while the clothes were burning. Rangel buried the burnt clothes and shoes in the backyard. Valencia gave Rangel a bullet and it was buried with the clothes and shoes.

After Castro left, Rangel, Valencia, and Lujan went to an auto parts store. Valencia bought two cans of engine degreaser. The three then went to Castro's house where Rangel asked Castro the location of George's vehicle. Castro told them where it was parked and gave Rangel the keys. Lujan and Rangel walked to the location of George's vehicle and sprayed it with the engine degreaser. They did so because Lujan and Castro had touched the vehicle and they were trying to remove the fingerprints.

The two guns from the shooting, a shotgun and a handgun, were placed in a box and taken to Marcus Contreras within a day or two.

Rangel denied that Valencia told him a few days later that he shot George in the head. Rangel also testified that Valencia did not tell him that he should not talk to the police. When Rangel saw the SUV after the day of the shooting, it had different tires and rims on it.

Rangel's testimony at Lujan's trial was considerably different regarding the events at the scene of the shooting. At Lujan's trial, Rangel testified that after Lujan shot George he saw Valencia jump out of the SUV and chase after George. Rangel then saw Valencia shoot George. When Valencia returned to the SUV, Rangel saw Valencia pull a handgun out of his waistband.

On cross-examination, Valencia's attorney reviewed with Rangel the different interviews he had with the investigating officers and the various statements he gave during those interviews. In the first and second interviews, Rangel told officers that Valencia did not shoot anyone, only Lujan shot George, with the shotgun and the handgun. Rangel also saw Lujan strike George in the head with the shotgun stock while George lay on the ground. Lujan returned to the SUV with two guns. Lujan also bragged about killing George, but Valencia never did so. The officers told Rangel he was lying, and implied that if he did not cooperate he would be charged with murder. The officers also ignored Rangel's attempts to convince them that Valencia did not shoot George.

In the third interview, three days later, Rangel told officers that Valencia shot George. Rangel changed his statement because he thought the officers wanted to hear his "assumptions or what I thought and what I think about it and what I think what happened. You

know, that's what I went on, on my assumptions of what I thought I saw." Rangel told the police what he thought they wanted to hear.

Rangel was not threatened by Valencia. Lujan asked Rangel to lie at Lujan's trial, and Rangel committed perjury at that trial. In addition, Lujan and Lujan's attorney told Rangel that Valencia's defense was to make Rangel out as the one who shot George. That made Rangel upset and convinced him to testify at Lujan's trial that Lujan shot George only once, and Valencia was responsible for the remaining shots. Those statements were false. It was only after Lujan's trial that Rangel met with Valencia's attorney and learned that Valencia was not going to assert that Rangel shot George. Finally, Rangel confirmed that Lujan shot George, but Valencia did not do so.

On redirect examination, Rangel admitted that he told detectives he was afraid of Valencia.

### *Marcos Contreras*

Marcos Contreras recalled someone bringing him a box with two guns in it and being asked to hide the guns. He was not certain if Valencia was one of the individuals who brought the guns. He traded the guns for drugs. His testimony consisted of primarily stating that he could not recall what occurred because he was on drugs at the time. He eventually admitted that Rangel and Valencia brought him the guns and that he traded them for drugs. He also traded some large rims and low profile tires for drugs.

### *Investigative testimony*

Officers recovered 13 nine-millimeter casings and seven bullets from the scene. Two $5 bills and three $1 bills were recovered from the scene. Blood was on the bills, and pieces of the currency also were lying nearby.

Shoe print evidence was collected from the scene of the shooting. An emblem was visible in some of the prints identifying one pair of shoes as manufactured under the brand K-Swiss. K-Swiss shoes were recovered from the burnt debris found in Rangel's backyard.

When interviewed, Contreras told officers that Valencia had brought him two guns in a box. Valencia told Contreras to hold the guns for him and that Contreras should give the guns only to Valencia. A few days later, Valencia returned to Contreras's house and stated that he had taken care of a problem.

The pathologist identified 23 gunshot wounds on

8

George's body. George was shot in the head five times, two of which were superficial abrasions. Each of the other three could have been the fatal shot. There also were gunshot wounds to the abdominal area, none of which would have been fatal. Gunshot wounds also were found on the buttocks, flank, and to the right hand, which had several fingers partially amputated. These injuries were not fatal.

***Stipulations***

The parties stipulated that if Valencia's mother, Maria Valencia, were to testify, she would admit that when she was asked by detectives if the tires and rims on the SUV had been changed after the date of the murder, she lied to the officers and stated they were not changed. The parties also stipulated there was no DNA or fingerprint evidence linking Valencia to the crimes.

## II. The Interviews

The following redacted video interviews were played for the jury.

***Castro's morning interview*** (December 14, 2006, 10:27 a.m.)

Castro stated that George came to his house around 1:00 o'clock on the afternoon of December 1. George stated he needed to obtain some methamphetamine. George had $8 and Castro had $5. They combined their funds and left to purchase methamphetamine. They went to Castro's normal supplier, but he did not have any methamphetamine to sell. The two then went to Valencia's house. Valencia stated he did not have any methamphetamine for sale. Lujan told them to go to the corner market and he would sell them the methamphetamine.

Castro and George went to the market and waited. Lujan walked up to George's vehicle and told Castro and George that they would have to go to the ranch where Lujan could weigh the methamphetamine. Lujan told Castro and George to follow him to the ranch. Lujan walked back to Valencia's house.

Lujan then left with Valencia and Rangel in the SUV. Castro and George followed. The cars turned off onto a dirt road and stopped. Lujan was standing near the open door of the SUV holding a sack containing what Castro believed was methamphetamine. Castro then told George to get out and buy the drugs.

George got out of the vehicle and walked towards Lujan. Lujan shot George in the stomach area. George ran towards the street. Lujan and Valencia chased after

George. Rangel did not do anything. Castro did not recall seeing a gun in Valencia's hand. Castro slid into the driver's seat, heard more gunshots, and saw George fall. When Lujan and Valencia caught up to George, Castro drove off because he thought he was going to be killed. Castro drove home. The interview ended at 11:10 a.m.

***Castro's afternoon interview*** (December 14, 2006)

In the second interview the detective began by asking about the gun Lujan had used. Castro described it as a big gun, bigger than a handgun, and black in color. Castro reiterated that Lujan shot George; George ran towards the street; he was chased by Lujan and Valencia; and he did not see Valencia with a gun. Valencia yelled, "Get that fool." Castro did not see George get shot; he simply heard a few shots and saw George fall down. Valencia and Lujan were near George when Castro drove off.

***Rangel's first interview*** (December 14, 2006, 11:25 a.m.)

This interview occurred after Castro's first interview. Detectives informed Rangel of his rights and told him that they were going to ask him questions about George's murder. They asked Rangel, "Are you a witness or a suspect?" Rangel replied that he was a witness. Rangel said he was afraid, and that he did not know George was going to be murdered.

Rangel was at Valencia's house when Castro and George showed up trying to buy methamphetamine. Lujan was going to sell George some methamphetamine, but apparently Lujan had a problem with George. Lujan told Castro and George to wait at the local convenience market. When Lujan came back he told Valencia and Rangel that it was time to leave. All three took off and Rangel thought they were going to Lujan's house. But they kept driving and ended up on the dirt road.

Lujan got out of the vehicle and told George to come over to him. When George came over, Lujan started shooting him. Valencia just waited. George started running. George fell and was shot repeatedly. Rangel was hesitant to say who shot George after the first shot. He stated he was afraid of Valencia "the most." Castro drove away in George's vehicle.

At the end of the interview, detectives told Rangel, "You really are a suspect because you never told the police about it. You could easily be charged for it. Understand?" After Rangel stated that he understood, the detectives said, "So you'll have to testify. Must. You're not the only one though. [Castro] too."

10

***Rangel's second interview*** (December 14, 2006, 8:05 p.m.)

This interview occurred after Castro's second interview. On the day of the murder, Rangel was at Valencia's house when Lujan came by to visit. A short while later the three heard Castro and George drive up. The three went outside where greetings were exchanged. Rangel and Valencia returned to the house. Lujan returned to the house a short while later and asked Valencia for a ride. Lujan apparently told Castro and George to wait at the local convenience store. Valencia, Lujan and Rangel entered Valencia's SUV and left. As the SUV passed George's vehicle, Lujan motioned for Castro and George to follow. In the SUV, Lujan stated that George wanted to buy methamphetamine. Rangel stated he wanted nothing to do with the transaction because he was on parole.

Valencia asked where they were going, and Lujan gave him directions. Lujan told Valencia to pull off onto a dirt road. George pulled in behind the SUV. Lujan got out of the vehicle and waived George over to him. Lujan returned to the rear door from which he had exited as George approached the SUV. Lujan pulled a shotgun out of the back seat of the SUV. George started to walk away and Lujan shot him. George ran away screaming, "what did I do?" Lujan screamed back, "you fucked up" and began chasing George.

When Lujan and George ran past George's sedan, Castro moved into the driver's seat and left the scene. Lujan kept chasing George and then Rangel heard more shots. Valencia got out of the SUV and went to see what Lujan was doing. When Rangel looked back, he saw Lujan running and Valencia walking towards the SUV. Lujan entered the SUV and then yelled at Valencia to get back into the SUV. Valencia got into the truck and drove back to his house. Rangel did not see another gun, but assumed Lujan had a pistol in his pants. Rangel did not think Valencia had a gun.

When they arrived at Valencia's house, Rangel stayed in the SUV while Valencia and Lujan entered the house. Rangel believed that Lujan put the guns in the house. Lujan would be the only one who knew the location of the guns. The three then went to Castro's house, where Lujan told Castro to keep his mouth shut. Lujan then asked Valencia to drive him to the auto parts store where Lujan bought some orange spray cans. They returned to Castro's house and learned where George's car was parked. Rangel retrieved the keys from Castro. Rangel gave the keys to Lujan, and the two walked to George's vehicle where Lujan sprayed the vehicle with the product purchased from the auto parts store. When they finished, Rangel and Lujan returned to Castro's

house.

***Rangel's third interview*** (December 17, 2006, 10:17 p.m.)

This interview occurred three days after the first two
interviews. Rangel was in custody for a violation of
parole. The detectives began by asking Rangel why he
had not been completely truthful in his prior
interviews. Rangel stated he was afraid someone would
hurt his family "or something like that."

On December 1, 2006, George was looking to purchase
methamphetamine. Rangel returned to the house because
he did not want to be involved. Valencia followed
Rangel into the house. Lujan had methamphetamine for
sale. When Lujan returned to the house, he said he was
going to sell George methamphetamine and asked Valencia
to give him a ride. The three got into the SUV, but
before they left Lujan and Valencia began talking about
George "in a weird way." Lujan said he was going to
sell George methamphetamine, and then the two started
saying things like "what if something happens" to
George. They also made comments like "let's go shoot
this fool." Rangel thought they were joking, and he did
not take the comments seriously.

Lujan told George and Castro to wait at the store and
he would sell them methamphetamine. Rangel, Lujan, and
Valencia got into the SUV and went towards the store.
Lujan was carrying a flannel sweater when they got into
the SUV. Lujan got the sweater from Valencia. Lujan had
a shotgun. Rangel had seen the shotgun at Valencia's
house on other occasions. Rangel deduced that Lujan was
carrying the shotgun in the sweater.

George and Castro were waiting at the store. Lujan
waived at them, indicating they should follow the SUV.
Rangel thought they were going to Lujan's mother's
house, but they passed that house. Lujan was telling
Valencia to keep driving straight.

Valencia pulled into the dirt road by the field and
Lujan exited the vehicle and motioned for George to
come over. Lujan said something about weighing the
methamphetamine and returned to the rear door of the
SUV. When George got close to the rear door of the SUV,
Lujan pulled out the shotgun and pointed it at George.
George asked what he had done. George started to leave
and Lujan shot him.

George took off running. Valencia got out of the SUV
and started chasing George. Lujan also started chasing
George. Castro moved into the driver's seat of George's
car and drove off. Rangel heard more shots. When he
looked into the rear view mirror he saw Lujan and

Valencia returning to the SUV. Lujan was carrying the shotgun. Valencia pulled a handgun out of the waistband of his pants and drove off.

When confronted by the detectives, Rangel admitted he saw Lujan and Valencia next to George and he saw Valencia shoot George "a lot of times." Valencia was kneeling down to shoot George. Rangel also admitted he saw Valencia shooting at George as the two ran. Valencia continued shooting after George fell.

When they returned to Valencia's house, Valencia said they needed to get rid of everything. Valencia said they needed to go to Rangel's house and burn their clothes. All three went to Rangel's house and Lujan and Valencia burned all of their clothing.

Castro stopped by when they were burning the clothes. Valencia and Lujan made comments indicating they did not trust Castro and they should kill him, too. Rangel told them to let him talk with Castro first. So when Castro stopped by, Rangel asked him to join them in his backyard. Valencia and Lujan were laughing about what happened. Later, Valencia told Rangel to bury the clothes that were burned in the barrel; Rangel did so. A bullet was buried with the burnt clothes. Valencia said he was going to do something with the guns, but Rangel did not know what Valencia's plans were.

Later, Valencia asked Rangel to join him and Lujan when they went to talk with Castro. Castro was cleaning George's car. Valencia told Castro to wait because the three of them were going to the auto parts store. When the three returned to Castro's house, Castro said he had moved George's vehicle to the parking lot of the apartment complex across the street. Valencia left and Lujan and Rangel walked to George's vehicle and sprayed it. As Lujan and Rangel walked back towards Castro's house, Valencia picked them up in a sedan and they went home.

A few days later, Rangel was present when Lujan and Valencia were talking about the shooting. Lujan stated he shot George in the chest and the arm. Lujan stated he shot off George's hand. Valencia stated he shot George in the head. Rangel denied he was afraid of Valencia.

(LD 7, 2-14.)

IV.   <u>Standard of Decision and Scope of Review</u>

In determining the appropriate deference to be given to a state court decision, it must be determined whether the decision

1  was on the merits within the meaning of 28 U.S.C. § 2254(d),

2  which limits habeas relief with respect to "any claim that was

3  adjudicated on the merits in State court proceedings...."   A

4  state court has adjudicated a claim on the merits within the

5  meaning of § 2254(d) when it decides the petitioner's right to

6  relief based on the substance of the constitutional claim raised,

7  rather than denying the claim because of a procedural or other

8  rule precluding state court review of the merits.  Lambert v.

9  Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).

10       Here, the CCA decided all of Petitioner's claims on the

11  basis of their substance; thus, the CCA's decision was a decision

12  on the merits.  However, the later decision of the CSC denying

13  Petitioner's petition for discretionary review of the CCA's

14  decision was not a decision on the merits, but rather was only a

15  determination that the California Supreme Court would not

16  consider the case on the merits.  Williams v. Cavazos, 646 F.3d

17  626, 636 (9th Cir. 2011), petition for cert. filed  80 BNA USLW

18  3282 (Oct. 10, 2011) (No. 11-465) (citing Harrington v. Richter,

19  – U.S. –, 131 S.Ct. 770, 784-85 (2011); Cal. R. Ct. 8.500; and

20  Campter v. Workers' Comp. Appeals Bd., 3 Cal.4th 679 (1992)).

21  The CCA's decision was the last decision in which the state court

22  adjudicated Petitioner's claims on the merits.  Where there has

23  been one reasoned state judgment rejecting a federal claim, later

24  unexplained orders upholding that judgment or rejecting the same

25  claim are presumed to rest upon the same ground.  Ylst v.

26  Nunnemaker, 501 U.S. 797, 803 (1991).  This Court will thus "look

27  through" the unexplained decision of the CSC to the CCA's last

28  reasoned decision as the relevant state court determination.  Id.

at 803-04; <u>Taylor v. Maddox</u>, 366 F.3d 992, 998 n.5 (9th Cir. 2004).

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Clearly established federal law refers to the holdings, as opposed to the dicta, of the decisions of the Supreme Court as of the time of the relevant state court decision. <u>Cullen v. Pinholster</u>, - U.S. -, 131 S.Ct. 1388, 1399 (2011); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003); <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).

A state court's decision contravenes clearly established Supreme Court precedent if it reaches a legal conclusion opposite to, or substantially different from, the Supreme Court's or concludes differently on a materially indistinguishable set of facts. <u>Williams v. Taylor</u>, 529 U.S. at 405-06. The state court need not have cited Supreme Court precedent or have been aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [it]." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

///

1    A state court unreasonably applies clearly established

2  federal law if it either 1) correctly identifies the governing

3  rule but applies it to a new set of facts in an objectively

4  unreasonable manner, or 2) extends or fails to extend a clearly

5  established legal principle to a new context in an objectively

6  unreasonable manner.  <u>Hernandez v. Small</u>, 282 F.3d 1132, 1142

7  (9th Cir. 2002); <u>see</u>, <u>Williams</u>, 529 U.S. at 407.

8    An application of clearly established federal law is

9  unreasonable only if it is objectively unreasonable; an incorrect

10  or inaccurate application is not necessarily unreasonable.

11  <u>Williams</u>, 529 U.S. at 410.  A state court's determination that a

12  claim lacks merit precludes federal habeas relief as long as it

13  is possible that fairminded jurists could disagree on the

14  correctness of the state court's decision.  <u>Harrington v.</u>

15  <u>Richter</u>, 562 U.S. -, 131 S.Ct. 770, 786 (2011).  Even a strong

16  case for relief does not render the state court's conclusions

17  unreasonable.  <u>Id.</u>  To obtain federal habeas relief, a state

18  prisoner must show that the state court's ruling on a claim was

19  "so lacking in justification that there was an error well

20  understood and comprehended in existing law beyond any

21  possibility for fairminded disagreement."  <u>Id.</u> at 786-87.  The

22  standards set by § 2254(d) are "highly deferential standard[s]

23  for evaluating state-court rulings" which require that state

24  court decisions be given the benefit of the doubt, and the

25  Petitioner bear the burden of proof.  <u>Cullen v. Pinholster</u>, 131

26  S.Ct. at 1398.  Habeas relief is not appropriate unless each

27  ground supporting the state court decision is examined and found

28  to be unreasonable under the AEDPA.  <u>Wetzel v. Lambert</u>, --U.S.--,

132 S.Ct. 1195, 1199 (2012).

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. at 1398. Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1). Id. at 1400. Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct. The petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.

A state court decision on the merits based on a factual determination will not be overturned on factual grounds unless it was objectively unreasonable in light of the evidence presented in the state proceedings. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). For relief to be granted, a federal habeas court must find that the trial court's factual determination was such that a reasonable fact finder could not have made the finding; that reasonable minds might disagree with the determination or have a basis to question the finding is not sufficient. Rice v. Collins, 546 U.S. 333, 340-42 (2006). To conclude that a state court finding is unsupported by substantial evidence, a federal habeas court must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record. Taylor v.

Maddox, 366 F.3d 992, 1000 (9th Cir. 2004).   To determine that a state court's fact finding process is defective in some material way or non-existent, a federal habeas court must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact finding process was adequate.   Id.

V.   Accomplice Instructions

Petitioner argues that the trial court's failure to instruct the jury that an accomplice's testimony must be corroborated violated Petitioner's right to due process of law.

A.   The State Court's Decision

The decision of the CCA on this issue was as follows:

**I. Accomplice Instructions**

Valencia argues that the jury could have inferred that Rangel was an accomplice to the murder, and therefore the trial court erred in failing to instruct the jury on accomplice principles.

A defendant may not be convicted on the testimony of an accomplice unless that testimony is corroborated. (§ 1111.) The corroboration must show more than merely the commission or the circumstances of the offense. (*Ibid.*)

An accomplice is one who is "liable to prosecution for the identical offense charged against the defendant...." (§ 1111.) "Whether a person is an accomplice is a question of fact for the jury unless the facts and the inferences to be drawn therefrom are undisputed." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103 (*Coffman*).)

The Legislature has deemed accomplice testimony so untrustworthy that it falls within the category of evidence that is insufficient as a matter of law to support a conviction. (*People v. Najera* (2008) 43 Cal.4th 1132, 1137 (*Najera*).) The distrust with which accomplice testimony is viewed finds its roots in English common law. (*People v. Tobias* (2001) 25 Cal.4th 327, 331.) The rationale generally stated is that an accomplice who testifies against a defendant does so either to obtain favor from the prosecutor or with the motive to place the responsibility for the crime on the

18

defendant by minimizing any involvement the witness may
have had in the crime. (*Ibid.*) This rationale explains
the long-standing requirement that when the prosecution
calls an accomplice to testify, the jury must be
informed that the testimony should be viewed with
distrust. (*People v. Guiuan* (1998) 18 Cal.4th 558, 565
(*Guiuan*).) Accordingly, Judicial Council of California
Criminal Jury Instructions, CALCRIM Nos. 334 and 335,
inform the jury that the testimony of an accomplice
testifying for the prosecution must be corroborated and
should be viewed with caution.FN3

> FN3. This requirement does not apply to
> accomplices who are testifying in favor of
> the defendant because an accomplice
> ordinarily does not benefit from such
> testimony. (*Guiuan, supra*, 18 Cal.4th at p.
> 567.)

Because accomplice testimony is insufficient to support
a conviction, the jury must be instructed to ensure it
does not rely solely on accomplice testimony. (*Najera,
supra*, 43 Cal.4th at p. 1137.) If there is sufficient
evidence to find a witness was an accomplice to the
crime, the trial court has a sua sponte obligation to
instruct the jury appropriately. (*Ibid.; Tobias, supra*,
25 Cal.4th at p. 331.) If there is not substantial
evidence to permit an inference that the witness was an
accomplice, accomplice instructions are not required.
*(People v. Boyer* (2006) 38 Cal.4th 412, 466 (*Boyer*).)
Accessories are not accomplices. (*Coffman, supra*, 34
Cal.4th at p. 103.)

The evidence did not establish clearly that Rangel was
an accomplice to George's murder. Nonetheless, the jury
could have inferred that he was an accomplice. In his
statements to the police, Rangel admitted he heard
Valencia and Lujan discuss murdering George, admitted
he saw Valencia and Lujan with weapons, and admitted he
was present when George was shot. Rangel's claim that
he thought Valencia and Lujan were joking about killing
George is the type of self-serving testimony accomplice
instructions are designed to address. If Rangel was an
accomplice, he would have a motive to minimize his
participation in the murder and shift the blame for the
murder to Valencia and Lujan. Therefore, the jury
should have been instructed on the use of accomplice
testimony if it determined that Rangel was an
accomplice. The trial court erred in failing to
instruct the jury sua sponte.

Reversal is not required, however, because Rangel's
testimony was amply corroborated. "Even where
accomplice instructions were required, we have found no
prejudice where, in fact, the witness's testimony was

sufficiently corroborated. [Citation.] ' "Such [corroborative] evidence 'may be slight and entitled to little consideration when standing alone. [Citations.]'" [Citation.] "Corroborating evidence 'must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that [such] evidence be sufficient in itself to establish every element of the offense charged.' [Citation .]" [Citation.]' [Citation.]" (*Boyer, supra*, 38 Cal.4th at p. 467.)

In the version of Rangel's testimony that implicated Valencia, Rangel told detectives (1) Valencia and Lujan spoke about murdering George before leaving Valencia's house; (2) Valencia gave Lujan a shotgun; (3) Valencia brought a handgun; (4) Lujan waived for George to follow Valencia's SUV; (5) they stopped at a dirt road, (6) Lujan shot George one time with a shotgun; (7) Lujan and Valencia chased George as George ran away; and (8) numerous shots were fired, killing George. After the murder (1) Valencia and Lujan burned their clothes in Rangel's backyard; (2) Valencia, Lujan and Rangel purchased an automotive product and sprayed it on George's vehicle; and (3) Valencia disposed of the guns and the tires and rims from the SUV.

Castro corroborated the facts of the events leading up to George's murder, including (1) the trip to Valencia's house, (2) following the SUV to the dirt road, (3) Lujan shooting George with a shotgun, (4) Valencia and Lujan chasing George, and (5) numerous shots being fired, killing George. Physical evidence also corroborated Rangel's testimony, including (1) the discovery of George's body, (2) numerous gunshot wounds suffered by George, (3) the injury to George's hand consistent with a shotgun blast, and (4) the numerous handgun casings found at the scene of the crime. Castro and physical evidence also corroborated the events after the murder. Castro observed the burning clothes and Rangel digging a hole in his backyard. The investigating officers recovered the remains of burnt clothes and a bullet consistent with the casings at the scene from Rangel's backyard. When George's vehicle was recovered, it was covered with a substance consistent with Rangel's description of the product sprayed on the vehicle. Contreras corroborated that he received the two weapons used in the murder from Valencia, as well as the tires and rims removed from the SUV.

The extensive corroboration of Rangel's testimony precludes any possible prejudice to Valencia as a result of the trial court's failure to instruct the jury with the principles of accomplice testimony. Moreover, the admonition in the instructions to view an accomplice's testimony with caution would not have

affected the jury's deliberations. Rangel's testimony, when considered with his three statements given to the detectives and his testimony at Lujan's trial, clearly established that Rangel was a liar. It was up to the jury to sift through the numerous versions given by Rangel of the events of that day and determine which version was the truth. Under the circumstances, the jury had to view Rangel's testimony with caution.

Finally, we note that Valencia implored the jury to accept the version of Rangel's story that exonerated him. In other words, Valencia's counsel urged the jury to accept the version of events that Rangel gave at the trial. Valencia, therefore, was urging the jury to find that Rangel was truthful at trial. Accordingly, an instruction informing the jury that Rangel's testimony should be viewed with caution would not have benefitted Valencia.

(LD 7, 14-18.)

> B.   <u>Analysis</u>

With respect to challenges to convictions based on error in jury instructions, the United States Supreme Court has held that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991). A claim that an instruction was deficient in comparison to a state model or that a trial judge incorrectly interpreted or applied state law governing jury instructions does not entitle one to relief under § 2254, which requires violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. §§ 2254(a), 2241(c)(3).

The only basis for federal collateral relief for instructional error is that the infirm instruction or the lack of instruction by itself so infected the entire trial that the resulting conviction violates due process. <u>Estelle</u>, 502 U.S. at 72; <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973); <u>see, Donnelly v.</u>

1  DeChristoforo, 416 U.S. 637, 643 (1974) (it must be established

2  not merely that the instruction is undesirable, erroneous or even

3  "universally condemned," but that it violated some right

4  guaranteed to the defendant by the Fourteenth Amendment).

5  Further, the instruction may not be judged in artificial

6  isolation, but must be considered in the context of the

7  instructions as a whole and the trial record. Estelle, 502 U.S.

8  at 72. It must be determined whether there is a reasonable

9  likelihood that the jury has applied the challenged instruction

10 in a way that violates the Constitution. Estelle, 502 U.S. at

11 72-73 (reaffirming the standard as stated in Boyde v. California,

12 494 U.S. 370, 380 (1990)). The Court in Estelle emphasized that

13 the Court had defined the category of infractions that violate

14 fundamental fairness very narrowly, and that beyond the specific

15 guarantees enumerated in the Bill of Rights, the Due Process

16 Clause has limited operation. Id. at 72-73.

17     Even if there is instructional error, a petitioner is

18 generally not entitled to habeas relief for such error unless it

19 is prejudicial. The Supreme Court has held that harmless error

20 analysis applies to instructional errors as long as the error

21 does not categorically vitiate all the jury's findings. Hedgpeth

22 v. Pulido, 555 U.S. 57, 61 (2008) (citing Neder v. United States,

23 527 U.S. 1, 11 (1999) (quoting in turn Sullivan v. Louisiana, 508

24 U.S. 275 (1993) concerning erroneous reasonable doubt

25 instructions as constituting structural error)). In Hedgpeth v.

26 Pulido, the Court cited its previous decisions that various forms

27 of instructional error were trial errors subject to harmless

28 error analysis, including errors of omitting or misstating an

element of the offense or erroneously shifting the burden as to
an element.  Hedgpeth, 555 U.S. 60-61.  To determine prejudice, a
federal court must determine whether a petitioner suffered actual
prejudice by assessing whether, in light of the record as a
whole, the error had a substantial and injurious effect or
influence in determining the jury's verdict.  Hedgpeth, 555 U.S.
at 62; Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).

A state is generally free under the Fourteenth Amendment to
construe and apply its laws regarding the evidence given by an
accomplice.  Lisenba v. People of the State of California, 314
U.S. 219, 227 (1941).  The federal law of due process does not
require giving instructions concerning corroboration or
credibility in connection with evidence of accomplice testimony.
(United States v. Augenblick, 393 U.S. 348, 352-53 (1969) (noting
that procedural due process claims concerning statutory rules
governing the use of accomplice testimony are not "catalogued
with constitutional restrictions"); Lankford v. Arave, 468 F.3d
578, 585 (9th Cir. 2006).  Cal. Pen. Code § 1111 states that a
conviction cannot be had on accomplice testimony unless it is
corroborated by such other evidence as shall tend to connect the
defendant with the commission of the offense.  This circuit has
held that § 1111 does not render accomplice testimony
inadmissible, but rather is a state law requirement that a
conviction be based on more than uncorroborated accomplice
testimony which is not required by federal law unless it is
incredible or insubstantial on its face.  Laboa v. Calderon, 224
F.3d 972, 979 (9th Cir. 2000).  Because § 1111 is a state rule,
federal habeas corpus relief is available only if a violation of

§ 1111 denied a defendant a due process right to fundamental fairness, such as where a defendant is deprived arbitrarily of a state law entitlement.  Id.

Here, there is no basis for a conclusion that Rangel's testimony was incredible or insubstantial on its face. Therefore, the Constitution did not necessarily require the giving of the corroboration instruction.  The Court will thus proceed to determine whether in view of the totality of the instructions, the failure to give the instruction so infected the entire trial that the resulting conviction violated due process.

The state court properly concluded that no such prejudice or unfairness resulted from the omission of the instruction.  The record supports the state court's reasoning concerning corroboration of Rangel's testimony.  Rangel's testimony concerning Petitioner's strange conversations with Lujan about George before leaving Petitioner's house was not directly corroborated, but it was consistent with Castro's extensive corroboration of Rangel's testimony that Petitioner was the apparent source of the car driven by the perpetrators and of the guns, Lujan arranged the ride to the remote location and the stop at a dirt road, both Lujan and Petitioner were present at the scene and chased the victim, Lujan shot the victim once with a shotgun, and other shots were fired that killed the victim.

The testimony of Marcos Contreras regarding receipt of the guns from Petitioner and Rangel further corroborated Rangel's testimony concerning Petitioner's being the source of the guns. Rangel's testimony was also corroborated by physical evidence of multiple gun casings at the scene, numerous gunshot wounds in the

victim's body, a hand injury consistent with a shotgun blast, and
bloody bills in the vicinity.  Castro's testimony as well as
physical evidence of burnt clothing and a bullet found in
Rangel's back yard that was consistent with casings at the scene
corroborated Rangel's testimony that Petitioner and Lujan burned
clothes in Rangel's back yard and that Rangel dug a hole.
Rangel's testimony that he and the perpetrators bought two cans
of engine degreaser used to spray the victim's car was
corroborated not only by Castro's testimony that he gave Lujan
the keys to the victim's car when Lujan arrived with a can of
engine degreaser, but also because the victim's car was covered
with a consistent substance.  The testimony of Marcus Contreras
concerning the receipt of tires and rims corroborated Rangel's
testimony that after the day of the shooting, Petitioner's SUV
had different tires and rims on it.  This corroboration tends to
implicate Petitioner, and it relates to the intent and conduct
elements of the crimes of murder and conspiracy.

     The Court rejects Petitioner's contention that Castro's
corroboration does not mitigate any prejudicial effect because
Castro himself was or might have been an accomplice.  There is no
evidence that before the fatal outing Castro knew of the danger
to George or Petitioner and Lucan's intentions to shoot or harm
George.  Likewise, there is no evidence that Castro engaged in
any act in furtherance of such an  intent at the scene or even
intended to aid the perpetrators in their nefarious purpose.
Thus, Castro could not have been subject to prosecution for the
identical offense charged against the defendant, and thus he
could not have been an accomplice under California law, which

1  requires that an accomplice have knowledge of the perpetrator's

2  criminal purpose and intend to encourage or facilitate commission

3  of the offense.  See, Cal. Pen. Code §§ 1111, 31; People v.

4  Richardson, 43 Cal.4th 959, 1023 (2008), cert. den., Richardson

5  v. California, 555 U.S. 1177 (2009).

6      Instead, Castro's departure after the shooting and his

7  conduct in washing and moving the victim's car renders him at

8  most a potential accessory after the fact, defined under

9  California law as one who, after a felony has been committed and

10 with knowledge that the principal has committed the felony,

11 harbors, conceals, or aids a principal in the felony with the

12 intent that the principal avoid criminal liability therefor.

13 See, Cal. Pen. Code §§ 31, 32; People v. Coffman, 34 Cal.4th 1,

14 103 (2004).  No corroboration instruction is required for a

15 witness who is an accessory after the fact.  People v. Coffman,

16 34 Cal.4th 103.

17     Other jury instructions made it likely that the jurors

18 carefully considered Rangel's testimony.  The jurors were

19 instructed to decide the case based only on the evidence

20 presented in the trial, to follow the law as instructed, and to

21 consider all instructions together.  The jurors were instructed

22 to use common sense and experience in judging the truth and

23 accuracy of evidence.  With respect to judging the credibility of

24 witnesses, jurors were to put aside prejudice and consider

25 anything that reasonably tended to prove or disprove the truth or

26 accuracy of the witness's testimony, including the witness's

27 opportunity to perceive and remember the substance of testimony,

28 the witness's behavior and attitude while testifying, the

witness's understanding of questions and providing a direct answer, bias or prejudice of the witness, promises of leniency or immunity, felony convictions and prior criminal acts, inconsistent statements, the reasonableness of the testimony, and the effect of other evidence on the facts about which the witness testified.  (Id. at 2050, 2055-58.)  Jurors were told to determine whether the defendant made oral or written statements before trial and the importance to give such statements; the jurors were to consider with caution evidence of a defendant's oral statement unless it was written or recorded, and they were instructed that the defendant could not be convicted on his own pretrial statements alone.  (Id. at 2061.)  The jury could consider flight and a defendant's hiding evidence or discouraging others from testifying as evidence of consciousness of guilt. (Id. at 2062-63.)

The jurors were also instructed that inconsistent statements could be used as evidence of the truth of the matters asserted, and they were instructed as to the burden of proof beyond a reasonable doubt.  (Id. at 2059-60, 2062, 2052.)  The jury was given the definition of one who aids and abets an offense and was told that aiding and abetting is not shown by mere presence at the scene of a crime which does not itself assist the commission of the crime, or mere knowledge that a crime is being committed and the failure to prevent it.  (Id. at 2063-64.)

In some sense, the defense benefitted from the lack of an instruction to view Rangel's testimony with caution.  The defense argued that Rangel was a perjurer and liar.  The defense also argued in effect that the extent of Petitioner's involvement in

27

the shooting was reflected in Rangel's first two interviews with
police, and not in Rangel's testimony at Lujan's trial and his
statements in the third interview with police, which defense
counsel argued were untrue and the product of Lujan's influence
and official coercion, respectively.  (11 RT 2014-21.)

     In summary, there was no absence of corroboration and no
dearth of instructions as to the law governing the consideration
of Rangel's testimony.  The prosecution's evidence of guilt was
strong.  The state court's decision finding no prejudice was not
an unreasonable application of clearly established federal law
within the meaning of § 2254(d)(1).

     Petitioner argues generally that the state court opinion
resulted in a decision that was based on an unreasonable
determination of the facts.  (Pet., doc. 2 at 28, 32.) However,
Petitioner has not specified how the state court's
fact-finding process was defective.

     The foregoing analysis reveals that an appellate panel
applying the standards of appellate review could reasonably
conclude that the state court's finding of no prejudice was
supported by the record and was not objectively unreasonable.
See, Taylor v. Maddox, 366 F.3d at 999-1001.  Further, the record
supports a conclusion that there was no material defect in the
state court's fact finding process.  Accordingly, it will be
recommended that Petitioner's claim concerning accomplice
instructions be denied.

     VI.  Exclusion of Evidence of Petitioner's Conversation
          with Robert Rangel

          Petitioner argues that exclusion of evidence of a

conversation between Petitioner and Rangel that occurred between the first and second interviews of Rangel violated Petitioner's due process right to offer exculpatory evidence, limited Petitioner's Sixth and Fourteenth Amendment right to confrontation, and thereby deprived Petitioner of a fair trial.

Rangel testified that he had not been threatened by Petitioner (8 RT 1351), but on redirect he admitted that he had told detectives that he was afraid of Petitioner. Rangel further testified that Lujan had asked him to lie during his testimony at Lujan's trial, and Lujan had said that Petitioner and his attorney were trying to pin the shooting on Rangel. Thus, Rangel testified at Lujan's trial that Lujan had only shot once, Petitioner was responsible for the remaining shots, and he then returned to the car and pulled a handgun out of his waistband.

In his first interview with law enforcement (3 CT 759-65), Rangel had admitted that he was scared to say whether more than one person shot the victim and that he was most afraid of Petitioner. (Id. at 760, 763-64.) Rangel testified that this meant he feared Petitioner might implicate him in the murder, not that Petitioner might retaliate. (8 RT 1370.) At the end of the first interview, detectives told Rangel that he was involved as a suspect or witness, that he really was a suspect because he never told the police about it, and that he could easily be charged for it; detectives ascertained that Rangel understood this, and Rangel was told that he would have to testify. (3 CT 765.) Rangel testified that this scared him. (9 RT 1383.)

Upon examination by the prosecutor, Rangel testified that between his first and second interviews he was brought face-to-

face with Petitioner.  (9 RT 1539-40.)  Petitioner's counsel
argued that the prosecutor's question created the inference that
seeing Petitioner caused Rangel to be fearful and to lie in his
subsequent statement; however, the confrontation between
Petitioner and Rangel had been set up by the interviewing
detective, and Petitioner and Rangel had actually stated during
the encounter that they were going to tell the truth.  (9 RT
1685-86.)  Petitioner's counsel offered Petitioner's statement
concerning the truth to show Rangel's state of mind with respect
to Rangel's statement and his testimony.  Petitioner argued that
it would show the impact on Rangel of having seen Petitioner.
The prosecutor argued that the statement was inadmissible
hearsay.  The court ruled that Petitioner's statements were
inadmissible.  (Id. at 1687.)

In closing argument, the prosecutor emphasized that Rangel
was afraid to implicate Petitioner.  She twice exhorted the
jurors to keep in mind that the second interview was conducted
shortly after Rangel and Petitioner had come face-to-face.  (11
RT 1932, 2038-39.)  The prosecutor argued that the third
interview, which supported the prosecutor's position[2], was held

---

[2] In the first and second interviews by law enforcement, Rangel gave
essentially consistent statements to the effect that Petitioner shot no one,
Lujan shot the victim with both guns and struck the victim on his head with a
shotgun while the victim was on the ground, Lujan returned to the vehicle with
both guns, and Lujan bragged about the killing; Petitioner did not brag about
it.  In the second interview, Rangel also indicated that after the shooting,
Petitioner said that he could not believe what Lujan had done.  Rangel
testified that the officers basically rejected this version, ignored
Petitioner's later attempts to say Petitioner was not the shooter, and implied
that if Rangel did not cooperate, he would be charged with murder.  Petitioner
testified that he then told the officers what they wanted to hear in order to
avoid being charged with murder.  (9 RT 1419.)

In the third interview, Rangel was in custody for a parole violation.
When asked why he had not told the truth earlier, Rangel said that he had been
afraid that someone would hurt his family or something like that.  (3 CT 664.)

several days later on December 17, when Rangel's sister had visited Rangel in jail and had told him to tell the truth. (Id. at 1932, 2039.)   The prosecutor emphasized that Rangel admitted being afraid of Petitioner in the first interview when he declined to provide the number of shooters, and he explained in his third interview his failure to tell the truth earlier was the result of fear of someone hurting his family or something like that. (Id. at 1933-35.)   The prosecutor also emphasized Rangel's statement in the third interview that he thought that he and Castro would have been the next victims if there had been more bullets that day. (Id. at 1936-37.)

Petitioner brought a new trial motion based on the trial court's failure to permit the introduction of Petitioner's statements made during the encounter with Rangel, noting that a detective's police report indicated that Petitioner told Rangel that Petitioner was going to tell the truth, and Rangel told Petitioner that Rangel was going to tell the truth. (4 CT 990, 956-93, 988-90.)   The trial court denied the motion for new trial. (12 RT 2157-58.)

A.   The State Court's Decision

The decision of the CCA on this issue was as follows:

**II. Exclusion of Testimony**

Rangel was interviewed twice on December 14, 2006, once in the late morning and once in the evening. Castro was interviewed twice that day also, before each of Rangel's interviews. Detectives, apparently thinking

Rangel stated that the only reason he and Eric Castro did not die the day of the shooting was because the shooters had no more bullets, and afterwards Petitioner had said that Rangel would be going down for conspiracy because Rangel was with Petitioner. (3 CT 690-91.)   Rangel denied that he was scared of Petitioner but stated that Rangel had been scared of everything. (Id. at 694-95.)

Rangel was not being truthful, allowed Rangel and
Valencia to encounter each other between Rangel's
interviews to see what would occur. From the comments
made by counsel, it appears that during this encounter
Valencia told Rangel to tell the truth.

Valencia attempted to introduce through Rangel the
comments made by Valencia during this encounter. The
People objected, arguing that Valencia's statements
were hearsay. The trial court sustained the objection
and precluded questioning about the conversation.

Hearsay evidence is evidence of a statement made by
someone other than the witness that is offered to prove
the truth of the matter asserted. (Evid.Code, § 1200,
subd. (a).) Hearsay statements generally are
inadmissible (id., subd. (b)), subject to several
exceptions (id., § 1220 et seq.).

Valencia argues the trial court's ruling was erroneous
because his statement was offered not for the truth of
the matter stated but to show Rangel's state of mind
when he gave the second interview. In the second
interview, Rangel placed blame for George's murder on
Lujan, thus exonerating Valencia. Valencia argues the
People argued to the jury that it could infer Rangel
was not truthful in the second interview because, when
he encountered Valencia, his fear of Valencia
intensified, causing him to place the blame for the
murder on Lujan. The evidence was essential, according
to Valencia, to show that Rangel did not have any
reason to be afraid of Valencia.

We are not persuaded. The words used by Valencia in the
abstract could not possibly convey the actual import of
the conversation. When Valencia told Rangel to tell the
truth, Rangel very well could have believed that
Valencia was telling him to tell the story as Valencia
wanted it told or else there would be adverse
consequences. Moreover, simply because Valencia told
Rangel to tell the truth does not mean that Rangel's
fear suddenly disappeared. Rangel told the detective in
the first interview that he was afraid of Valencia. A
short conversation such as the one that apparently
occurred between Rangel and Valencia may have had no
effect on whether Rangel was afraid of Valencia, or may
have made Rangel more afraid of Valencia. There is no
logical path that can be drawn from Valencia's
statements to Rangel's fear, or lack thereof.
Accordingly, Valencia's statements were not relevant to
any issue before the trial court because they did not
have "any tendency in reason to prove or disprove any
disputed fact that [was] of consequence to the
determination of the action." (Evid.Code, § 210.) Since
only relevant evidence is admissible (id., § 350), the

trial court did not err in excluding Valencia's
statements.

The relevant evidence that could have emerged from the
encounter was Rangel's testimony of whether he was or
was not afraid of Valencia, which was admitted, and any
observations from either Rangel or observers about
Valencia's body language that may have assisted the
jury in determining whether Valencia was attempting to
intimidate Rangel.

Even if we assume that the trial court erred in
excluding Valencia's statement, we can discern no
prejudice from the error. Improper exclusion of
evidence can result in reversal only if we conclude,
after an examination of the entire record, that the
error has resulted in a miscarriage of justice. (Cal.
Const., art. VI, § 13.) A miscarriage of justice occurs
only when it is reasonably probable that a jury would
have reached a more favorable result for the defendant
if the error had not occurred. *(People v. Moore* (1996)
44 Cal.App.4th 1323, 1331.)

As discussed above, the statements made by Valencia to
Rangel had little probative value. The words
themselves, taken out of context, were meaningless. It
was the context of the statements that would provide
the jury with a picture of Rangel's state of mind when
he spoke with officers in the second interview. Because
the words themselves had so little value, admitting
them into evidence would not have resulted in a more
favorable result for Valencia.

    B.   <u>Analysis</u>

Although state and federal authorities have broad latitude

to establish rules excluding evidence from criminal trials, the

Due Process Clause of the Fourteenth Amendment and the Compulsory

Process and Confrontation clauses of the Sixth Amendment

guarantee a criminal defendant a meaningful opportunity to

present a complete defense. <u>Crane v. Kentucky</u>, 476 U.S. 683, 690

(1986). It is a fundamental element of due process of law that a

defendant has a right to present a defense by compelling the

attendance and presenting the testimony of witnesses. <u>Washington</u>

<u>v. Texas</u>, 388 U.S. 14, 18-19, 23 (1967). However, a defendant

does not have an absolute right to present evidence without reference to its significance or source; rather, the right to present a complete defense is implicated when the evidence the defendant seeks to admit is relevant, material, and vital to the defense. Id. at 16. Further, the exclusion of the evidence must be arbitrary or disproportionate to the purposes the exclusionary rule is designed to serve. Holmes v. South Carolina, 547 U.S. 319, 324-25 (2006). If the mechanical application of a rule that is respected, frequently applied, and otherwise constitutional would defeat the ends of justice, the rule must yield to those ends. Chambers v. Mississippi, 410 U.S. 284, 302 (1973).

Well established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Holmes v. South Carolina, 547 U.S. at 326. Thus, it is constitutionally permissible to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues. Holmes v. South Carolina, 547 U.S. at 326-27.

Where exclusion of evidence violates a petitioner's right to present a defense, habeas relief is the appropriate remedy only if the constitutional violation resulted in error that was not harmless, that is, error that resulted in actual prejudice, or had a substantial and injurious effect or influence in determining the jury's verdict. Jackson v. Nevada, 688 F.3d 1091, 1104 (9th Cir. 2012) (citing Fry v. Pliler, 551 U.S. 112, 121-22 (2007) and Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)). To consider whether the Brecht standard has been met, a

court considers various factors, including but not limited to 1) the importance of the witness's testimony to the prosecution's case, 2) whether the testimony was cumulative, 3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, 4) the extent of cross-examination otherwise permitted; and 5) the overall strength of the prosecution's case. Merolillo v. Yates, 663 F.3d 444, 455 (9th Cir. 2011) (citing Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)).

The Confrontation Clause of the Sixth Amendment, made binding on the states by the Fourteenth Amendment, provides that in all criminal cases, the accused shall enjoy the right to be confronted with the witnesses against him.  Pointer v. Texas, 380 U.S. 400 (1965).  The main purpose of confrontation as guaranteed by the Sixth Amendment is to secure the opportunity for cross-examination to permit the opponent of the party presenting a witness to test the believability of the witness and the truth of his or her testimony by examining the witness's story, testing the witness's perceptions and memory, and impeaching the witness. Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (Confrontation Clause was violated by prohibiting a party from cross-examining to impeach the witness by showing bias); Davis v. Alaska, 415 U.S. 308, 316 (1974) (Confrontation Clause was violated by prohibiting a defendant from examining a key prosecution witness to show that the witness was on probation for juvenile delinquency and thus vulnerable and biased).  What is guaranteed is the opportunity for effective cross-examination subject to the wide discretion of the trial judge to impose reasonable limits

based on concerns about harassment, prejudice, confusion of the issues, the safety of the witness, or avoidance of repetitive and only marginally relevant interrogation.  Delaware v. Van Arsdall, 475 U.S. at 679.  Adequate cross-examination entails not only the right to ask the witness about a relevant topic, such as bias, but also the right to make a record from which to argue concerning the topic.  Hayes v. Ayers, 632 F.3d 500, 518 (9th Cir. 2011).

Here, the prosecutor examined Rangel concerning his fear of Petitioner and specifically regarding his confrontation with Petitioner between Rangel's interviews.  Further, the prosecutor argued repeatedly that Rangel's story changed in the third interview when he was exhorted to tell the truth by a family member, but Rangel's initial version had been repeated because of Rangel's fear of Petitioner.  Petitioner's words during the confrontation were not being offered for a hearsay purpose of the truth of the matter asserted, but rather to show the effect of Petitioner's words on Rangel.  Significant evidence concerning Rangel's fear, or lack of fear, of Petitioner was admitted at trial.  Contrary to the conclusion of the state court, evidence of Petitioner's statements to Rangel constituted additional evidence of a confrontation that was to some extent already in evidence, and Petitioner's words and behavior were relevant because they tended to show the presence, nature, and intensity of any threat made towards Rangel and any resulting fear harbored by Rangel.  Rangel's state of mind was significant because it was his testimony that inculpated Petitioner, who had a significant interest in impeaching Rangel.  It is possible, but not certain,

that the proffered evidence would have consumed undue time.
Further, because the issue of Rangel's fear was already raised,
it does not appear that admission of the evidence would have
confused the issues.

    It is unclear whether the evidence was vital to the defense,
or whether the jury would have had a significantly different view
of Rangel's credibility if the evidence had been admitted.
However, even assuming exclusion of Petitioner's words to Rangel
during the confrontation somehow diminished Petitioner's
presentation of his defense, the state court reasonably
determined that any such error was not sufficiently prejudicial.
Although Rangel's testimony was important, extensive evidence of
Rangel's state of mind with regard to Petitioner and Lujan was
introduced.  Other evidence of bias was present.  There was
substantial evidence corroborating and contradicting Rangel's
testimony on various material points.  Rangel testified at trial
that Petitioner did not tell him not to talk to police.  Rangel's
testimony at Petitioner's trial concerning Petitioner's conduct
in the shooting was supported in many respects by his earlier
interviews and contradicted by evidence of his testimony at
Lujan's trial to the effect that Petitioner chased George when he
fled after the initial shot, shot George, returned to the car,
and pulled a handgun out of his waistband.  Further, Petitioner's
attorney engaged in extensive cross-examination of Rangel
regarding his various interviews, which were before the jury in
the form of transcripts and recordings.  The prosecution's case
was strong; Castro corroborated Rangel's testimony on many
points, and there was strong physical and circumstantial evidence

of Petitioner's guilt.  Petitioner had ample opportunity to confront and cross-examine Rangel regarding his credibility and the truth of his testimony by testing his perceptions and memory, examining Rangel's story, and exploring various bases of bias.

The Court concludes that the exclusion of Petitioner's words to Rangel did not have a substantial and injurious effect or influence in determining the jury's verdict.  The state court's decision that any violation was harmless was not contrary to, or an unreasonable application of, clearly established federal law.

VII.  <u>Comment on Petitioner's Failure to Testify</u>

Petitioner argues that his privilege against self-incrimination and his right to due process of law were violated by the prosecutor when in the course of a discussion about the admission of evidence, she commented that if the Petitioner wanted to present evidence, he could testify himself.

A.  <u>The State Court's Decision</u>

The pertinent portion of the decision of the CCA is as follows:

**III. Prosecutorial Misconduct**

Valencia contends the prosecutor committed misconduct numerous times during trial. Well-established principles govern review of claims of prosecutorial misconduct.

"'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.] Under state law, a prosecutor who uses deceptive or reprehensible methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citations.]

"'A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion,

38

and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.' [Citation.] A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored. [Citation.]

"'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] ... under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 965-966.)

With one exception (*Griffin*FN4 error), Valencia's counsel did not object to any of the claimed acts of misconduct. Instead, Valencia moved for a new trial after the guilty verdict was rendered, arguing each of the grounds asserted in this appeal. He argues the trial court erred in denying his motion, relying on many of the same grounds asserted in the trial court.

> FN4. *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).

"' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been

39

a proper exercise of discretion on such motion, each
case must be judged from its own factual background." '
[Citation.]" (*People v. Turner* (1994) 8 Cal.4th 137,
212, overruled on other grounds in *People v. Griffin*
(2004) 33 Cal.4th 536, 555, fn. 5.)

As we shall explain, we conclude the prosecutor did not
use deceptive or reprehensible means during the trial.
Nor did the few actions committed by the prosecutor
that may have been improper result in Valencia
receiving an unfair trial. Accordingly, the prosecutor
did not commit misconduct, and the trial court did not
abuse its discretion in denying Valencia's motion for a
new trial.

We also emphasize that in many cases a timely objection
and admonition would have eliminated many of the
claimed grounds of misconduct. The failure to request
an admonition results in a forfeiture of the argument
unless an admonition would have been futile. (*People v.
Kipp* (2001) 26 Cal.4th 1100, 1130 (*Kipp* ).) To the
extent that Valencia now claims the absence of
objection establishes that trial counsel was
ineffective, we reject the claim. As explained, most of
the actions were not objectionable. For those
prosecutorial actions that were objectionable, or at
least questionable, Valencia cannot establish
prejudice, or that trial counsel did not have a valid
tactical reason for not objecting. We therefore reject
Valencia's argument.

Finally, to the extent that Valencia claims the
prosecutor's misconduct deprived him of his rights
under the federal and state Constitutions to due
process, equal protection, and an impartial jury, these
claims are not preserved for appellate review because
he did not object on these grounds at trial. (*People v.
Earp* (1999) 20 Cal.4th 826, 878.) We now review the
grounds on which Valencia relies.

### A. *Griffin* error

In *Griffin, supra*, 380 U.S. at page 615, the Supreme
Court held that the Fifth Amendment, applicable to the
states through the Fourteenth Amendment, "forbids
either comment by the prosecution on the accused's
silence or instructions by the court that such silence
is evidence of guilt." The prosecution argued in
*Griffin* that the defendant was the only one who could
explain his presence at the scene of the crime, and his
refusal to testify was because his explanation would
implicate him in the crime. *Mitchell v. U.S.* (1999) 526
U.S. 314, 330 extended the prohibition against drawing
negative inferences from a defendant's silence to
sentencing proceedings. If the *Griffin* prohibition is
violated, we must reverse "unless we can conclude [the

error] was harmless beyond a reasonable doubt." (*People v. Hardy* (1992) 2 Cal.4th 86, 154.) In other words, to "paraphrase the high court, we ask whether, absent the prosecutor's reference to [the defendant's] failure to testify, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty? [Citation.]" (*Ibid.*)

Valencia contends the prosecutor violated the *Griffin* prohibition on two occasions. First, during closing argument, the prosecutor began discussing the three statements Rangel gave to detectives. She then stated, "I ask that when you go back and deliberate, listen to the interviews. Listen to the questions that Detective Bonsness asked the defendant (*sic*). And when you listen to the second interview-"

At this point, Valencia's counsel objected. The prosecutor stated she misspoke, and clarified that she was talking about the interview with Rangel. The trial court reminded the jury that if there was a question about the testimony, the jury could ask for the relevant portions to be read back and that there was no burden on Valencia "to do one solitary thing. The only burden's on the prosecution."

The context of the prosecutor's closing argument clearly demonstrates that she merely misspoke, and was not commenting on the failure of Valencia to testify. Indeed, the comment refers to an interview, and there was no interview of Valencia admitted into evidence. This mistake does not violate the *Griffin* prohibition.

The second alleged error is not resolved so easily. During cross-examination of Castro, the following comments occurred.

"Q: Do you remember testifying [in Lujan's trial] that [Valencia] never asked you to put this case on to [Lujan]?

"[The prosecutor]: Objection, your Honor. Calls for hearsay. If [Valencia] wants to testify, he can.

"[Valencia's attorney]: Your Honor, I'm going to object right now and I'm requesting an immediate sidebar."

An unreported conference was conducted. When the parties returned, the trial court then made the following comment to the jury:

"Ladies and Gentlemen, the remark by the prosecution insinuating a burden on the part of the defense is incorrect. There is absolutely no burden on the part of the defense or defense counsel. We previously in jury selection advised that neither the defendant nor his

attorney have to do one solitary thing. There's no
burden on the part of the defense or defendant to speak
or do anything. Please disregard any comment made by
the prosecution or any insinuation. Please give that no
weight whatsoever."

As the People concede, the comment by the prosecutor
was "regrettable." The People, however, argue that the
principles of *Griffin* were not violated because the
comment was part of an objection, and did not direct
the jury to infer that Valencia was guilty because he
did not testify. While there is some validity to the
People's argument, we will assume, arguendo, that the
comment violated the principles of *Griffin*, but reject
Valencia's claim of error because he cannot demonstrate
any prejudice arising from the comment.

When addressing the issue of prejudice, "'we must focus
upon the extent to which the comment itself might have
increased the jury's inclination to treat the
defendant's silence as an indication of his guilt. The
risk that a comment will have this effect may become
considerable if either the court [fn. omitted] or the
prosecution [fn. omitted] "solemnizes the silence of
the accused into evidence against him" ... by telling
the jury "that from the failure of [the defendant] to
testify ... the inferences from the facts in evidence
[should] be drawn in favor of the State." ... A
forbidden comment, however, is less likely to affect
the "substantial rights" of a defendant ... if that
comment merely notes the defendant's silence and
includes no suggestion that, among the various
inferences which might be drawn therefrom, those
unfavorable to the defendant are the more probable. As
the court pointed out in *Griffin*, absent such a
suggestion "the inference of guilt is not always so
natural or irresistible." ... We do not mean to imply
that a prohibited comment is necessarily or even
ordinarily harmless so long as it is unaccompanied by a
statement that silence implies guilt; we simply note
that the absence of any such statement tends to
mitigate the independently damaging effect of a comment
uttered in violation of the *Griffin* rule.' " *(People v.
Vargas* (1973) 9 Cal.3d 470, 478-479, bracketed material
in original.)

It is not reasonable to interpret the prosecutor's
argument as an assertion that Valencia's failure to
testify was evidence of his guilt. The prosecutor was
not commenting on Valencia's failure to testify. She
commented that the appropriate method for introducing
the evidence trial counsel was seeking was through
Valencia's testimony. This comment falls within the
category of comments that could be construed as noting
Valencia's silence. We emphasize that the comment could
be so construed because it is not at all obvious that

1
2
3
4
5
6
7
8

it would be so construed. Moreover, the trial court immediately emphasized to the jury that the prosecutor's comment was improper, and that Valencia was not required to "do one solitary thing. There's no burden on the part of the defense or defendant to speak or do anything." Thus, the jury immediately was instructed that it was not to draw any inference from Valencia's silence. Finally, in the closing instructions, the jury was instructed that Valencia had a constitutional right not to testify, and that it should not consider Valencia's failure to testify "for any reason at all." Under these circumstances, we conclude beyond a reasonable doubt that the comment was harmless, i.e., the jury would have reached the same result if the comment had not been made.

9   (LD 7, 20-25.)

10          B.  Analysis

11          The Fifth Amendment privilege against self-incrimination,

12   made binding on the states through the Fourteenth Amendment,

13   prohibits a court from instructing, and a prosecutor from

14   commenting, on a defendant's decision not to testify.  Griffin v.

15   California, 380 U.S. 609, 615 (1965).  Griffin error may be

16   harmless error.  Chapman v. California, 386 U.S. 18, 22 (1967).

17   Griffin error warrants habeas corpus relief in a § 2254

18   proceeding where the error has a substantial and injurious effect

19   or influence in determining the jury's verdict.  Cook v. Schriro,

20   538 F.3d 1000, 1021 (9th Cir. 2008), cert. den., 555 U.S. 1141

21   (2009).  Griffin error is not harmless where the comment is

22   extensive, an inference of guilt from silence is stressed to the

23   jury as the basis of conviction, and there is evidence that could

24   have supported an acquittal, Anderson v. Nelson, 390 U.S. 523,

25   523-24 (1968) (per curiam); Cook v. Schriro, 538 F.3d at 1021.

26   This circuit has recognized that a comment upon the defendant's

27   failure to testify is impermissible if it manifestly was intended

28   to call attention to the defendant's failure to testify or is of

such a character that the jury would naturally and necessarily regard it as a comment on the failure to testify. Cook v. Schriro, 538 F.3d at 1021 (citing Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987)). Griffin error may be deemed harmless even in the absence of a curative instruction where the comments are limited in nature and could not have affected the verdict. Hovey v. Ayers, 458 F.3d 892, 912-13 (9th Cir. 2006).

Here, the prosecutor's comment came in the course of the defense's cross-examination of a witness regarding the witness's testimony in Lucan's separate trial. In response to a question to Castro regarding whether he recalled his testimony in Lujan's trial concerning what Petitioner had said, the prosecutor objected on hearsay grounds and then stated that if Petitioner wanted to testify, he could. Although the comment was made in the presence of the jury, it was not a comment that expressly called the jury's attention to either Petitioner's failure to testify or any inference that might be drawn from his failure to testify. The comment was brief, and the prosecutor did not invite the jury to use Petitioner's silence to infer substantive guilt of the offense. Further, there were multiple witnesses as to Petitioner's participation in the incident that resulted in George's death, as well as strong physical evidence and abundant circumstantial evidence demonstrating and corroborating his participation in the incident and in the destruction or concealment of evidence.

The jury was instructed to disregard the remark. The jury was instructed that a defendant has an absolute constitutional right not to testify and to rely on the state of the evidence;

jurors were not to consider for any reason at all, discuss, or allow themselves to be influenced by the fact that the defendant did not testify. (11 RT 2061.) As a general proposition, jurors are presumed to follow the instructions given. See, Weeks v. Angelone, 528 U.S. 225, 234 (2000). Neither party points to any portion of the record to support the conclusion that the jury failed to heed the instruction to disregard the prosecutor's remark.

In summary, the state court reviewed the evidence and applied the general case law concerning Griffin error; its decision that any Griffin error was harmless was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, it will be recommended that the claim concerning Griffin error be denied.

VIII.   Vouching

Petitioner challenges the prosecutor's use of the expression "we know" in argument, which Petitioner asserts occurred some sixty times with respect to contested matters of evidence and constituted improper vouching. Although defense counsel did not object during argument, the defense moved for a new trial and raised the vouching argument in the motion.

A.   The State Court's Opinion

The opinion of the CCA concerning the vouching issue is as follows:

B. *Use of "we know" in closing argument*

During closing argument, the prosecutor often used the phrase "we know" to explain to the jury why the evidence supported the conclusion that Valencia killed George. The following excerpt from the prosecutor's closing argument demonstrates the prosecutor's technique.

"Robert Rangel stood up in court and he demonstrated for you how [George] positioned his body immediately before the first shot struck [George]. [Lujan] FN5 (*sic*) showed you that [George] turned around like this. That was the position that [George] was in when [Lujan] fired the first shot. That shot struck [George's] hand.

FN5. The prosecutor meant to refer to Rangel.

"*We know* that, ladies and gentlemen, because we saw the autopsy photos. *We know* that the injury to [George's] hand was caused by a shotgun. We know that they wanted to kill ... George, but after that first shot ... Lujan froze. That's what ... Castro testified to. He froze and he stood, according to ... Castro, there for a minute.

"... Castro then told you that while ... Lujan was standing there, [Valencia] jumped out of that [SUV] and yelled to [Lujan] get that fool. That's what happened, ladies and gentlemen. *We know* that.

"When [Valencia] yelled to [Lujan] get that fool, [Valencia] and [Lujan] started chasing [George]. [George] ran around his car and he started running toward [the street]. *We know* that, ladies and gentlemen. *We know* that. And the reason why *we know* that is because there was a stipulation that was read into the record where Greg Laskowski, who is a forensic criminalist, analyzed the vehicle that [George] had driven that day and the stipulation, in a nutshell, in summary, basically tells you that Greg Laskowski observed bloodstains on the right passenger's side of [George's] vehicle." (Italics added.)

According to Valencia, the prosecutor used the phrase "we know" 60 times. Valencia did not object to the use of the phrase at any point during closing argument. This is especially significant because an objection would have stopped the practice, and an admonition would have eliminated any possibility that the jury misunderstood the argument. Nonetheless, Valencia contends the phrase should not have been used because it insinuated the prosecutor was either (1) vouching for the credibility of a witness, or (2) relying on evidence not contained in the record to conclude the facts were established with certainty.

In reviewing claims of misconduct during closing argument, we focus on how the statement would, or could, have been understood by a reasonable juror in the context of the entire argument. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) "No misconduct exists if a juror would have taken the statement to state or imply nothing harmful." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 839.)

A reasonable juror would have treated the prosecutor's comments as her argument to support the conclusion that the evidence established Valencia was guilty of murdering George. The prosecutor was advocating her theory of the case, which is the reason for closing argument. There was nothing harmful that the jury could infer from the prosecutor's use of the phrase. This conclusion is supported by the lack of objection. Trial counsel established throughout the trial that he was willing to object repeatedly, including during closing argument. The lack of objection establishes that at the time the prosecutor was using the phrase, trial counsel did not find it improper. If diligent trial counsel did not find the phrase objectionable at the time it was being used, it is unlikely that the jury would conclude the prosecutor was vouching for the witness or relying on evidence outside of the record.

To support his argument, Valencia cites *U.S. v. Younger* (9th Cir.2005) 398 F.3d 1179 (*Younger*). The prosecutor in *Younger* used the phrase "we know" repeatedly in closing argument. The defendant argued that the prosecutor committed misconduct in so doing. The appellate court found no error.

> "We do not condone the prosecutors' use of 'we know' statements in closing argument, because the use of 'we know' readily blurs the line between improper vouching and legitimate summary. The question for the jury is not what a prosecutor believes to be true or what 'we know,' rather, the jury must decide what may be inferred from the evidence. We emphasize that prosecutors should not use 'we know' statements in closing argument.

> "Nonetheless, the record in this case confirms that the prosecutors used the phrase 'we know' to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements. [Citation.] The prosecutors' statements thus were not improper. [Citations.] Moreover, in the context of the entire trial, we conclude that the prosecutors' use of 'we know' did not materially affect the verdict. [Citation.]" (*Younger, supra*, 398 F.3d at p. 1191.)

While we agree that the better practice is to avoid using the phrase "we know" in closing argument, we conclude there was no error in this case. The example cited above is an example of the prosecutor marshalling

47

evidence, and not an attempt to vouch for witness veracity or suggest evidence not produced would support a witness's statement.

Valencia has cited a few specific examples of portions of the prosecutor's closing argument he finds particularly objectionable. We begin with the prosecutor's discussion of Castro's and Rangel's motivations.

> "One other thing you can look at in evaluating a witness' credibility is bias. In other words, do they have a motive to say what they say? Do they have a motive to lie?

> "In terms of ... Castro and ... Rangel, we have bias running in opposite directions, don't we?

> "[Castro's] relationship with [George], who he referred to as a cousin and a close friend, they were good friends, right? That's what he testified to.

> "And I'm quite sure [Valencia's counsel] is going to get up here shortly and he's going to tell you that you should not believe [Castro]. He's going to tell you well, [Castro] uses drugs or was using drugs back then-[¶] ... [¶]

> "Well because of that relationship between [George] and [Castro] *we know* that [Castro] is telling the truth because he is strongly motivated to say what he saw, because he is strongly motivated for the person, the right person, to be held responsible for killing his friend.

> "Now let's talk about [Rangel]. *We all know* that he was present at the crime scene, so the question, once again, is how are you, as a juror, going to determine what is the truth?

> "*We know* that ... Rangel was interviewed on December the 14th of 2006 by Deputy Bonsness, and *we know* that there were two interviews conducted on that day. We've been referring to the first interview as the A.M. interview. And *we also know* that his second interview was conducted later on that evening, I believe somewhere around eight o'clock." (Italics added.)

Valencia focuses on the fifth quoted paragraph to argue

that the prosecutor was impermissibly vouching for
Castro's credibility. We disagree. Much of Valencia's
argument focuses on the facts that support his belief
that Castro was not credible. That was an argument to
be made to the jury. When the entire context of this
portion of closing argument is considered, it is clear
the prosecutor was referring to the facts that support
her claim that Castro was credible. No inference or
insinuation can be gleaned from this argument that
suggests the prosecutor had knowledge not in the record
to prove Castro was credible.

Valencia next refers to the prosecutor's argument when
she was discussing whether Lujan and Valencia planned
to murder George.

> "[Castro] also told you that when he was
> inside ... Rangel's backyard he saw [Rangel]
> digging a hole and *we know* that's where they
> put the clothing that they wore that day. *We
> know* that's where they put the shoes that
> they had worn when they killed [George]. *We
> know* that, ladies and gentlemen, because the
> police officers found that evidence a couple
> of days later.

> "*We all know* that Valencia did not have to
> drive ... Lujan to this remote area [in the
> country] for [Lujan] to sell [George] a $20
> bag of dope. *We know* that. *We know* that drug
> deals are made on street corners. *We know*
> that drug deals are made in alleys. They did
> not have to drive ... George to a remote area
> just to sell him a $20 bag of dope." (Italics
> added.)

Valencia argues that there was no evidence where drug
deals occurred, and that such knowledge was beyond the
common experience of jurors. Therefore, according to
Valencia, when the prosecutor used the phrase "we know"
to talk about drug deals, she was vouching for her
personal knowledge about where drug deals occurred.

We disagree with the premise of Valencia's argument. We
are confident that in this day and age it is within the
common experience of the average juror that
transactions, such as this one, for a small amount of
methamphetamine, do not normally occur in remote areas
of a county. Certainly it is possible that they would
occur in such areas, but it is much more likely such
transactions occur in town. Indeed, the minimal gas in
the tank of George's vehicle, as testified to by
Castro, confirms that George did not intend to drive to
the country to purchase the methamphetamine when they
began their trek.

*People v. Woods* (2006) 146 Cal.App.4th 106 relied on by Valencia is inapposite. As relevant to this case, Woods held that a prosecutor committed misconduct when she argued, "'Well, you know if that were true, there wouldn't be kids who could drive their cars right up to the curb, put their hand out, exchange some money and drive off. It is a regular swap meet in Los Angeles County right now, ladies and gentlemen. If you want the drugs, you can pretty much drive up to any street in Los Angeles-.'" (*Id.* at p. 115.) There was no evidence admitted at trial to support these comments, and the appellate court found the matters were not within the common experience of the average juror.

We do not disagree with this holding, but it is a far cry from asserting you can buy illegal drugs on any corner of a city as large as Los Angeles and asserting that small drug transactions generally occur in an area other than a remote area in the country. The prosecutor did not err and did not imply she had knowledge outside of the record to support her argument.

Next, Valencia refers to the following portion of the prosecutor's closing argument:

> "*We know* [Valencia] and ... Lujan planned it. *We know* they did, because during the third interview [Rangel] said [Valencia] said it as a joke, what would happen if, and then [Lujan] just went along with it, yeah, huh, and then they just started talking some crazy shit, you know.

> "QUESTION: Like what?

> "Here's Detective Bonsness once again asking an open-ended question, like what?

> "ANSWER: Talking like oh, let's go, let's go, let's go.

> "QUESTION: Let's do what?

> "ANSWER: Let's go shoot him or something like-and at first I thought it was a joke, you know.

> "ANSWER: [Lujan] shows him a sack of dope and that's when he came around, and then when [Lujan] came back to the door to-to say he was gonna weigh it out and-

> "[QUESTION:] To say what?

> "Here's, once again, Detective Bonsness asking an open-ended question, to say what?

"[ANSWER:] He said he was gonna weigh it out. He told-

"QUESTION: He said he was gonna weigh it out?

"Here's the detective clarifying because he's getting information. He's clarifying.

"[QUESTION:] He said he was gonna weigh it out?

"ANSWER: For-but he didn't have no scale. That's his intention right there was just to get the shotgun when he went back into the truck.

"*We know* they planned it. *We know* they pre-armed themselves. *We know* they drove them to-drove [George] to a remote location for one purpose, and that was to kill him."
(Italics added.)

Valencia contends the prosecutor was stating her personal opinion, and the facts were not irrefutable. The prosecutor was arguing logical conclusions and inferences from the testimony adduced at trial. It certainly was logical to conclude that Lujan and Valencia planned to murder George. They drove George to a remote location where the crime was unlikely to be observed. They came to that location armed with a shotgun and a handgun. Lujan induced George to leave his vehicle by showing a bag of what appeared to be methamphetamine. When George approached, Lujan used a pretext to reach into the SUV and obtain the shotgun. He then shot George. When George ran away, Valencia exited the vehicle, chased George, and started shooting him. Valencia finished him off by kneeling down and shooting George repeatedly in the head. Once again the prosecutor was using the phrase "we know" to marshall evidence, not to imply knowledge outside of the record.

Valencia makes similar complaints about short portions of the prosecutor's rebuttal argument that refer to Rangel's lying during trial and suggesting that the statement Rangel gave that implicated Valencia was the truth. Once again, this statement cannot be read to refer to matters outside the record, but were simple statements to argue the evidence established Valencia's guilt.

We repeat, the better practice is to avoid using a phrase such as "we know" and rely on the state of the evidence when arguing a case to the jury. But in this case, the prosecutor used this crutch "to marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness

veracity or suggest that evidence not produced would support a witness's statements." (*Younger, supra*, 398 F.3d at p. 1191.) The record establishes that the prosecutor did not hold herself out as an unsworn witness, but merely referred to facts contained in the record. As such, the prosecutor did not commit misconduct. (*People v. Roberts* (1992) 2 Cal.4th 271, 310.)

(LD 7, 25-32.)

    B.   Legal Standards

    It is clearly established federal law within the meaning of § 2254(d)(1) that a prosecutor's improper remarks violate the Constitution only if they so infect the trial with unfairness as to make the resulting conviction a denial of due process. Parker v. Matthews, – U.S. -, 132 S.Ct. 2148, 2153 (2012) (per curiam); see, Darden v. Wainwright, 477 U.S. 168, 181 (1986); Comer v. Schriro, 480 F.3d 960, 988 (9th Cir. 2007). Prosecutorial misconduct deprives the defendant of a fair trial as guaranteed by the Due Process Clause if it prejudicially affects the substantial rights of a defendant. United States v. Yarbrough, 852 F.2d 1522, 1539 (9th Cir. 1988) (citing Smith v. Phillips, 455 U.S. 209, 219 (1982)). The standard of review of claims concerning prosecutorial misconduct in proceedings pursuant to § 2254 is the narrow standard of due process, and not the broad exercise of supervisory power; improper argument does not, per se, violate a defendant's constitutional rights. Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)). This Court must thus determine whether the alleged misconduct has rendered a trial fundamentally unfair. Darden v. Wainwright, 477 U.S. at 183. It must be determined whether the prosecutor's actions constituted misconduct, and whether the conduct violated Petitioner's right

52

to due process of law. <u>Drayden v. White</u>, 232 F.3d 704, 713 (9th Cir. 2000).

To grant habeas relief, this Court must conclude that the state court's rejection of the prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Parker v. Matthews</u>, – U.S. –, 132 S.Ct. 2148, 2155 (2012) (per curiam) (quoting <u>Harrington v. Richter</u>, 562 U.S. at –, 131 S.Ct. at 767-87 (2011)). In addition, the standard of <u>Darden v. Wainwright</u> is a very general one that leaves courts with more leeway in reaching outcomes in case-by-case determinations. <u>Parker v. Matthews</u>, 132 S.Ct. at 2155 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). In determining whether remarks in argument rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision. <u>Boyde v. California</u>, 494 U.S. 370, 385 (1990); <u>Darden v. Wainwright</u>, 477 U.S. 168, 179-82. In <u>Darden</u>, the Court considered whether the prosecutor manipulated or misstated evidence, whether specific rights of the accused were implicated, the context of the remarks in light of both parties' arguments, the instructions given by the trial court, and the weight of the evidence. <u>Darden</u>, 477 U.S. at 179-82.

Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony. <u>United States v.</u>

Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993).  Vouching for the
credibility of a witness or expressing a personal opinion
concerning the accused's guilt can pose two dangers.  First, it
can convey the impression that evidence known by the prosecutor
but not presented to the jury supports the charges, and thus it
can jeopardize the defendant's right to be tried solely on the
basis of the evidence presented to the jury.  United States v.
Young, 470 U.S. 1, 18 (1985).  Second, the prosecutor's opinion
reflects the imprimatur of the government and may induce the jury
to trust the government's judgment rather than its own assessment
of the evidence.  Id. at 18-19.  When a prosecutor engages in
argument that violates the ethical principle that a lawyer not
express a personal belief or opinion in the truth or falsity of
any testimony or evidence, the violation must be viewed in
context to determine whether the prosecutor's conduct affected
the fairness of the trial.  United States v. Young, 470 U.S. at
10-11.  To determine whether prejudicial error occurred, a court
must consider the probable effect of the prosecutor's argument on
the jury's ability to judge the evidence fairly.  Id. at 12.
Vouching for a witness's credibility is more likely to be
damaging where the credibility of the witness is crucial.  United
States v. Edwards, 154 F.3d 915, 921 (9th Cir. 1998).  The
standard of Darden v. Wainwright is a very general one that
leaves courts with more leeway in reaching outcomes in case-by-
case determinations.  Parker v. Matthews, 132 S.Ct. at 2155
(quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).
Prosecutors may argue reasonable inferences based on the
evidence, including that one of the two sides is lying.  United

States v. Necoechea, 986 F.2d at 1276.

C. Procedural Bar

Respondent argues that Petitioner's vouching claim is procedurally barred because prosecutorial misconduct claims are forfeited for failure to object and request an admonition, and the state court implicitly found that Petitioner had forfeited his vouching argument.

Review of the state court decision shows that the state court cited authority and separately noted that with the exception of the Griffin error, Petitioner's trial counsel had not objected to any of the claimed acts of misconduct.  (Doc. 7, 20, 21.)  Although the state court again mentioned the absence of an objection in addressing the number of instances of alleged misconduct (id. at 26, 27), the court nevertheless addressed the vouching issue at length and decided the case on the merits.  The court referred to the absence of objection as a factor tending to show that it was unlikely that counsel or the jury considered the prosecutor to be vouching for the witness or relying on evidence outside the record.  (Id. at 27.)  The Court did not clearly set forth an alternative holding of procedural default.  Accordingly, this Court will address the vouching contention.

D. Analysis

Review of the state court decision reveals that the state court carefully considered the prosecutor's argument in light of the totality of the evidence and concluded that the prosecutor was marshaling the evidence and arguing inferences from the evidence, but was not giving personal assurances of a particular witness's veracity or suggesting that there was any information

outside the record that supported a specific witness's testimony. A review of the prosecutor's entire closing arguments (11 RT 1909-16, 1922-49, 2027-47) supports the state court's conclusion. The argument was framed by references to the evidence, and the substance of the prosecutor's argument was a review of the evidence as it chronologically unfolded. (See, e.g., id. at 1910-12, 1925:19-23 through 1926.)  Many times the prosecutor's statements of "we know that" were accompanied by express explanatory phrases referring to the supporting evidence.  (Id. at 1912:20-21, 1913:6-14, 1922:22-28 through 1923:1-9, 1924:8-21, 1925:2-18, 1928:3-17, 1929:25-28 through 1930:1-11, 1931:1-6, 1935:6-28 through 1936:1-10, 1936:22-28 through 1937:1-8, 1938:11-15, 2027:2-28 through 2028:1-12, 2029:25-28, 2034:6-10, 2035:12-26, 2040:19-23, 2042:8-28 through 2043:1-18, and 2047:13-15.)  In other instances, the statements were interspersed among detailed reviews of portions of the evidence.  (Id. at 1914-1916, 1926:22-28, 1928, 1931:7-26, 1938:16-28 through 1939:1-6, 1939:7-21, 1942:25-28 through 1943:1-12, and 2031:23-28 through 2032:1-4).

The prosecutor's argument emphasized not the prosecutor's personal belief in the credibility of any witness or specific source of the evidence, but rather the inferences that the prosecutor urged the jury to draw in light of the totality of the evidence.  The prosecutor did not manipulate or misstate the evidence.  The prosecutor's argument was grounded in the evidence presented to the jury, and there is no basis for a conclusion that the prosecutor was suggesting that there was evidence outside the record that supported the inferences that the

prosecutor urged the jurors to draw.

Further, the jurors were given standard instructions on deciding for themselves what the facts were, not letting bias influence their decision, not considering things said by attorneys as evidence, the difference between direct and circumstantial evidence and the evaluation of such evidence, the factors that the jurors should consider when they judged the credibility of witnesses, and the evaluation and use of inconsistent statements in general as well as pretrial statements of the defendant.  (Id. at 2050, 2053-62.)  In addition, the evidence against the Petitioner, which came from multiple sources and was corroborated, was strong.

In summary, the Court concludes that the record does not reflect any harmful or prejudicial effect on the jury's determination of the verdict or on the substantial rights of the Petitioner.  In its totality, the argument did not infect the trial with unfairness and render the resulting conviction a denial of due process.  The state court's decision that there was no prejudicial prosecutorial misconduct in the form of vouching was not an unreasonable application of clearly established federal law.

Finally, although Petitioner generally argues that the state court's decision was based on an unreasonable determination of facts, the foregoing review demonstrates that the state court's decision did not constitute an unreasonable determination of facts.  The transcript of the prosecutor's argument and the remainder of the record support a conclusion by a reasonable fact finder that the state court's finding concerning the prosecutor's

conduct was supported by the record.  Any appellate court reviewing the state court's process would be reasonable in holding that the state court's fact finding process was adequate. See, Rice v. Collins, 546 U.S. at 340-42; Taylor v. Maddox, 366 F.3d at 1000.

Accordingly, it will be recommended that Petitioner's claim concerning prosecutorial misconduct be denied.  Because the Court concludes that Petitioner's claims are not meritorious, it will be recommended that the petition for writ of habeas corpus be denied.

IX.   Certificate of Appealability

Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the Court of Appeals from the final order in a habeas proceeding in which the detention complained of arises out of process issued by a state court.  28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).  A certificate of appealability may issue only if the applicant makes a substantial showing of the denial of a constitutional right.  § 2253(c)(2).  Under this standard, a petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  A certificate should issue if the Petitioner shows that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right, or (2) whether the district court was correct in any procedural ruling.

1  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

2  In determining this issue, a court conducts an overview of

3  the claims in the habeas petition, generally assesses their

4  merits, and determines whether the resolution was debatable among

5  jurists of reason or wrong.  Id.  An applicant must show more

6  than an absence of frivolity or the existence of mere good faith;

7  however, it is not necessary for an applicant to show that the

8  appeal will succeed.  Miller-El v. Cockrell, 537 U.S. at 338.

9  A district court must issue or deny a certificate of

10 appealability when it enters a final order adverse to the

11 applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

12 Here, it does not appear that reasonable jurists could

13 debate whether the petition should have been resolved in a

14 different manner.  Petitioner has not made a substantial showing

15 of the denial of a constitutional right.  Accordingly, it will be

16 recommended that the Court decline to issue a certificate of

17 appealability.

18 X.  Recommendations

19 In accordance with the foregoing, it is RECOMMENDED that

20 1)  The petition for writ of habeas corpus be DENIED; and

21 2)  Judgment be ENTERED for Respondent; and

22 3)  The Court DECLINE to issue a certificate of

23 appealability.

24 These findings and recommendations are submitted to the

25 United States District Court Judge assigned to the case, pursuant

26 to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of

27 the Local Rules of Practice for the United States District Court,

28 Eastern District of California.  Within thirty (30) days after

being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:     June 13, 2013**                    **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE